**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| RICKY RICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 1:16-CV-00062 PLC |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Ricky Rice (Plaintiff) seeks review of the decision of the Acting Social Security Commissioner, Nancy A. Berryhill, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[2] For the reasons set forth below, the case is reversed and remanded.

## I.     *Background and Procedural History*

On August 22, 2013, Plaintiff filed applications for Supplemental Security Income and Disability Insurance Benefits. (Tr. 144-56). The applications allege disability beginning on May 1, 2012, and were based on the following medical conditions: kidney failure, thyroid problems, colon problems, severe cluster headaches, lower back pain, neuropathy, left leg problems, high blood pressure, and high cholesterol. (Tr. 71, 80). On September 27, 2013, the Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). (ECF No. 8).

[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 7).

1

an administrative law judge (ALJ). (Tr. 71-88, 99-101). In a decision dated October 21, 2014, the ALJ found that Plaintiff "has not been under a disability within the meaning of the Social Security Act from May 1, 2012, through the date of this decision." (Tr. 29). The SSA Appeals Council denied Plaintiff's subsequent request of review of the ALJ's decision on February 1, 2016. (Tr. 1-4). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     The Administrative Proceeding

### A.  Testimony at Hearing

Plaintiff appeared with counsel at an administrative hearing in September 2014. (Tr. 45-70). Plaintiff testified that he was fifty-one years old, had a GED, and lived alone in an apartment. (Tr. 48, 59, 61). Plaintiff most recently worked in a factory for approximately three months in August 2013 before quitting because his back pain made it difficult to stand. (Tr. 49, 59). Prior to this, Plaintiff assembled lawn mower engines from 2008 to 2012, and worked as a truck driver. (Tr. 49-51).

Plaintiff testified that the sciatic nerves in his back, numbness in his feet and left leg, and swollen joints, likely caused by his diabetes, limited his ability to work. (Tr. 54). Plaintiff took Januvia for his diabetes which "pretty much" controlled his diabetes, although his blood sugar levels still fluctuated "quite a bit." (Tr. 54-55). He took medication for his thyroid and for high blood pressure, both of which he had been taking since 2009. (Tr. 55). Plaintiff stated that his blood pressure "runs high" and in the six months before the hearing, his medication level was increased. (Tr. 56). Plaintiff also testified that he took gabapentin and Tramadol for his hands, joints, and back pain and that he was prescribed a muscle relaxer but was not taking it because he could not afford the medication. (Tr. 56-57). For depression, Plaintiff took Cymbalta that "kind

of help[ed] a little" but he was not currently seeing a psychiatrist because he did not have insurance. (Tr. 58). Plaintiff stated that he did not have side effects from his medications. (Tr. 64)

Plaintiff's pain level before medication was normally a seven out of ten, and medication reduced it to a six out of ten. (Tr. 57). Plaintiff also testified that a bath would help relieve his pain, but he had difficulty getting in and out of the bathtub. (Tr. 64).

During the day, Plaintiff spent most of his time lying down, sometimes watching television. (Tr. 60). When cleaning his house, Plaintiff would have to take breaks approximately every ten minutes. (Tr. 60, 64). Plaintiff's sister-in-law did his laundry. (Tr. 61). Plaintiff could cook his own meals and go to the grocery store, but a friend usually accompanied him. (Tr. 61-62). When Plaintiff tried to go to the store himself the day before the hearing it "didn't go too well" and he had to leave his groceries at the door and rest before retrieving them. (Tr. 61). The only place Plaintiff regularly went was to the doctor and church on Sundays. (Tr. 61-62). Plaintiff stated that he did not drive so family usually drove him. (Tr. 59-60). Finally, Plaintiff testified that he could walk half a block or less before he needed to stop and rest. (Tr. 63).

A vocational expert, Susan Shea, also testified at the hearing. (Tr. 65). The ALJ asked Ms. Shea to consider a hypothetical individual with the same age, education, and work experience as Plaintiff who was capable of:

> work at the light exertional level with the following additional limitations. He can occasionally climb ramps and stairs, stoop, and crouch. He should never climb ladders, ropes, or scaffolds, kneel, or crawl. He should avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery. He should likewise avoid concentrated exposure to vibration.

(Tr. 67). Ms. Shea stated that with these restrictions, the hypothetical individual would not be able to perform any of Plaintiff's past jobs, but would be able to perform other jobs available in

significant numbers in the economy. (Id.). When the ALJ added the condition that the hypothetical individual needed to be able to alternate between sitting and standing at the work station one to three minutes every hour, Ms. Shea testified that there would still be available jobs. (Tr. 68). The ALJ further altered the hypothetical to allow the individual to have at least two fifteen-minute breaks in addition to regularly scheduled morning, lunch, and afternoon breaks. (Tr. 68) Ms. Shea testified that there would be no available jobs in the economy under those conditions. (Tr. 68-69).

### B. Relevant Medical Records[3]

In February 2011, before the alleged onset date, Plaintiff saw Dr. Christopher Montgomery. (Tr. 313-15). Plaintiff reported a history of hypertension, diabetes, hypothyroidism, hyperlipidemia, and colonic polyps. (Tr. 313). Dr. Montgomery noted that Plaintiff was in "no acute distress" and had a normal mood, affect, attention span, and concentration. (Id.). Plaintiff's medications were updated to include lisinopril, Pravachol, Januvia, and levothyroxine sodium. (Tr. 314-15).

Plaintiff returned to Dr. Montgomery in June 2011 complaining of abdominal bloating and rectal pain. (Tr. 310-12). Plaintiff reported he was not taking his cholesterol medications, but was trying to eat healthier and had lost some weight. (Tr. 310). Plaintiff's physical exam was unremarkable, and Dr. Montgomery ordered a basic metabolic panel and a colonoscopy for Plaintiff's rectal pain and muscle spasms. (Tr. 311).

In September 2011, Plaintiff saw Dr. Montgomery to discuss his laboratory results. (Tr. 307-09). Plaintiff's cholesterol level had "improved some" but his constipation continued and his

---

[3] Because mental impairments are not at issue in this case, the Court will not discuss records relating to Plaintiff's mental health.

abdomen was distended. (Tr. 307-08). Dr. Montgomery advised Plaintiff to change his diet and "try a one[-]time dose of mag citrate" to treat his constipation. (Id.).

In December 2011, Plaintiff returned to Dr. Montgomery complaining of abdominal bloating. (Tr. 305-06). Plaintiff stated he had no appetite and could go two weeks without having a bowel movement. (Tr. 305). An exam revealed that Plaintiff's abdomen was round, tight, and had "generalized tenderness with no masses[.]" (Tr. 306). Dr. Montgomery ordered an EGD and a colonoscopy. (Id.). Plaintiff met with Dr. Montgomery to review laboratory results in March 2012. (Tr. 301-04). Plaintiff reported he was not eating or taking his medications properly. (Tr. 301). Dr. Montgomery advised Plaintiff to eat more healthfully and take his medications as prescribed. (Tr. 302). Dr. Montgomery noted Plaintiff's colonic polyps had "improved" and diagnosed Plaintiff with microalbuminuria. (Tr. 303).

Plaintiff saw Dr. Mowaffaq Said in April 2012 for proteinuria and chronic kidney disease. (Tr. 294-96). Plaintiff reported he did not have difficulties controlling his blood pressure and A1c levels but did report right side lower back pain. (Tr. 294). Plaintiff also reported that he was laid-off from his job the Thursday before the appointment and was going to school to be a probation officer. (Id.). Dr. Said noted that Plaintiff was six feet three inches tall and weighed 258 pounds, "fe[lt] good" physically, and had no depression or anxiety. (Id.). A renal ultrasound done in March 2012 "showed no evidence of obstruction." (Tr. 295). Dr. Said diagnosed Plaintiff with hypertension, diabetes mellitus, dyslipidemia, minimal proteinuria, decreased GFR, and "most likely diabetic nephropathy." (Id.). Dr. Said advised Plaintiff to follow up in six months. (Tr. 295-96).

In October 2012, after the alleged onset date, Plaintiff saw Dr. Tirso Aldana at Poplar Bluff Regional Medical Center for head and eye pain. (Tr. 266-70). Dr. Aldana's exam was

unremarkable. (Tr. 267). Dr. Aldana diagnosed Plaintiff with arterial hypertension and high blood pressure and prescribed lisinopril. (Tr. 266). The next day, Plaintiff saw Dr. Said for his six-month follow-up appoitnment. (Tr. 292-93). Plaintiff complained of "sinus pressure, sinus drainage, yellow sputum, and headache" and reported that he had lost his insurance so he was not seeing his primary care physician, taking his blood pressure medication, or taking Januvia for his diabetes. (Tr. 292). Dr. Said noted "no gross hematuria, no flank pain, no edema, and no shortness of breath." (Id.). Dr. Said diagnosed Plaintiff with an upper respiratory infection, prescribed medications to treat it, and directed Plaintiff to return to his office in three months. (Tr. 292-93).

Later that month, Plaintiff saw Dr. Kenneth Studyvin at Poplar Bluff Regional Medical Center for a headache. (Tr. 259-63). Plaintiff reported the pain was the "worst in [his] life" and rated it at a nine out of ten. (Tr. 260). Dr. Studyvin noted Plaintiff was "anxious, in obvious distress, [and] severely distressed." (Tr. 261). Dr. Bryan Meyers did a CT scan of Plaintiff's head and found no acute intracranial process, a "probably old" left medial orbital wall blowout fracture, and mild frontal atrophy. (Tr. 264). Dr. Studyvin diagnosed Plaintiff with cephalgia and hypertension, prescribed Plaintiff Norco, increased his lisinopril dosage, and advised Plaintiff to follow up with Dr. Shahid Choudhary. (Tr. 259). Plaintiff saw Dr. Choudhary several days later and diagnosed him with a migraine. (Tr. 255-57).

In January 2013, Plaintiff saw Dr. Said for a follow-up appointment. (Tr. 291). Plaintiff complained of sinus drainage, stated that his blood pressure was "running high," and reported that he had stopped taking Pravastatin and adjusted his levothyroxine dosage on his own due to financial difficulties. (Id.). Dr. Said prescribed medications to treat Plaintiff's upper respiratory infection and clonidine for Plaintiff's hypertension. (Id.). Dr. Said noted that Plaintiff's

electrolytes, "renal bone disease/mineral bone disease" and parathyroid hormone were controlled. (Id.).

Plaintiff saw Dr. Raymond Ketting at Poplar Bluff Regional Medical Center in May 2013. (Tr. 251-54). Plaintiff complained of flank pain in the left and right low back, which Dr. Ketting described as mild. (Tr. 253). Dr. Ketting noted that Plaintiff had not taken his Synthroid prescription in a month, diagnosed Plaintiff with hypothyroidism, and refilled his Synthroid. (Tr. 251-52).

In June 2013, Plaintiff began treatment at C&S Medical where he saw Nurse Practitioner Jo Crabtree, FNP. (Tr. 272-73). Nurse Crabtree noted that Plaintiff's diabetes was controlled with medication, he weighed 291 pounds, and he reported no joint or back pain, anxiety, depression, headaches, or migraines. (Tr. 273). Nurse Crabtree ordered laboratory testing and updated Plaintiff's medications to lisinopril, levothyroxine, Flexeril, and Bactrim DS. (Tr. 273, 274-76).

Plaintiff returned to C&S Medical in August 2013 complaining of left hip and thigh pain that "hurt[] to the bone." (Tr. 252-53). Plaintiff described the pain as sharp and reported that the pain was constant, but worsened when he stood for long periods of time. (Tr. 352). A musculoskeletal exam showed a radiating pain pattern and a reduced range of motion in the left hip. (Tr. 353). Plaintiff received prescriptions for Neurotin and Tramadol and advice to use rest, ice, compression, and elevation therapy for his hip pain. (Id.). Plaintiff was further advised to have an MRI, visit a neurologist when he could afford it, and follow up at C&S Medical in one month. (Id.).

Later that month, Plaintiff saw Dr. Said for a follow-up appointment. (Tr. 290). Plaintiff reported that he was having low back pain and difficulty emptying his bladder, but had no

headache, no edema, no nausea, no gross hematuria, and no dysuria. (Id.). Dr. Said noted that Plaintiff's gait was normal, his hypertension was controlled, and his chronic kidney disease stage III was stable. (Id.). Plaintiff was taking medication for hypothyroidism and Tramadol, gabapentin, and Flexeril for lower back pain. (Id.). Dr. Said advised Plaintiff to follow up in six months or "sooner if needed." (Id.).

On September 24, 2013, Dr. Mark Gates performed a lumbar x-ray. (Tr. 298). Dr. Gates noted a slight dextroscoliotic curve in the spine, but stated it "could even be due to positioning." (Id.). Dr. Gates's final impression was that there were "no acute findings in the lumbar spine." (Id.).

In October 2013, Plaintiff returned to C&S Medical. (Tr. 349-51). Plaintiff complained of "right and left leg pain to where they give out on him," depression, and painful bowel movements, "if he even has one[.]" (Tr. 349). Plaintiff's physical exam was unremarkable except for bilateral leg and hip pain. (Tr. 349-50). At his next appointment at C&S Medical in December 2013, Plaintiff complained of clogged and popping ears and high blood pressure. (Tr. 346-48). Plaintiff reported he was fatigued and that the week before his visit his blood sugar levels were in the "upper 200's." (Tr. 346). Plaintiff did not report musculoskeletal problems. (Tr. 349-51).

Plaintiff underwent chest x-rays and an abdominal CT scan in January 2014. (Tr. 339-40). The x-rays showed "no acute cardiopulmonary process," and the abdominal scan revealed a "small periumbilical herniation measuring up to 2.3 cm which contains a loop of small bowel[,]" a "supraumbilical midline abdominal wall herniation measuring up to 3.7 cm diameter containing fat only, without bowel involvement[,]" and "diverticulosis without diverticulitis." (Tr. 340). There was no bowel wall edema or obstruction and no hydronephrosis. (Id.).

Later that month, Plaintiff saw gastroenterologist Dr. Rafid Hussein. (Tr. 354-57). Dr. Hussein noted Plaintiff reported no pain, had no functional limitations, and functioned independently. (Tr. 354). Plaintiff's exam revealed fatigue and weight change, "spots before eyes[,]" sinus problems, ringing in ears, hearing problems, frequent wheezing, abdominal bloating, stool changes, constipation, change in stool caliber, blood in stools, back pain, muscle cramps, dry skin and rash, abnormal thirst, and anxiety. (Tr. 354). Due to Plaintiff's "apparent high grade polyp history[,]" Dr. Hussein ordered a colonoscopy. (Tr. 356).

Plaintiff also visited C&S Medical in January 2014, complaining of a "big knot" under his left arm. (Tr. 344-35). Nurse Crabtree diagnosed Plaintiff with an abscess on the left axillae and prescribed Plaintiff Bactrim DS. (Id.). An exam revealed no gross sensory or motor deficits. (Tr. 345). Nurse Crabtree noted that Plaintiff had applied for disability and opined that "he would benefit greatly from the diagnostics and treatments he would be afforded. I sincerely believe he will have a poor prognosis if he cannot receive proper and consistent medical care." (Id.).

In March 2014, Plaintiff underwent a colonoscopy at Saint Francis Medical Center. (Tr. 334-36). Plaintiff's musculoskeletal exam revealed no joint deformity and his gait was normal. (Tr. 335). Plaintiff had "some mild edema in his feet." (Id.).

In June 2014, Plaintiff returned to C&S Medical for a follow-up appointment. (Tr. 342-43). Plaintiff reported that he had throbbing joint pain, dry mouth, and difficulty breathing at night. (Tr. 342). His exam was unremarkable. (Id.).

Nurse Crabtree completed a medical source statement in August 2014. (Tr. 360-62). Nurse Crabtree reported that Plaintiff was diagnosed with hip pain, major depression, diabetic neuropathy, hypertension, type II diabetes, chronic sciatica and "DJD." (Tr. 360). She stated that

Plaintiff's symptoms included "chronic joint pain, difficulty ambulating, dizziness, fatigue[,] numbness in lower extremities, hips 'give out,' [and] palpitations." (Id.). Nurse Crabtree rated Plaintiff's bilateral hip and leg pain as moderate to severe and reported that Plaintiff had a "slow, unsteady gait" and side effects such as dizziness, nausea, and weakness from his medications. (Id.). She estimated that Plaintiff could: frequently lift less than ten pounds, occasionally lift ten pounds, and rarely lift twenty pounds; never twist, stoop, balance, crouch, crawl, or climb; occasionally finger or feel with his hands and frequently reach or handle; sit for ten minutes before needing to change positions; sit for two hours in an eight-hour work day; stand for ten minutes at a time; and stand for less than two hours of an eight-hour work day. (Tr. 361). Nurse Crabtree further opined that Plaintiff would require two to three unscheduled breaks during a work day, would need to elevate his legs for two hours of an eight-hour work day, and would likely have four "bad days" per month due to his symptoms. (Tr. 362). Finally, Nurse Crabtree reported that Plaintiff needed a cane, but could not afford one. (Id.).

### C. The ALJ's Determination

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520 and § 416.920[4] and found that Plaintiff: (1) had not engaged in substantial gainful activity since May 1, 2012; (2) had severe impairments of degenerative disc disease, peripheral neuropathy, and obesity and the non-severe impairments of microalbuminuria, proteinuria, headaches, colon problems, essential hypertension, diabetes mellitus, thyroid disorder, anxiety disorder, and

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

mental health; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR § 404, Subpart P, Appendix 1. (Tr. 31-33). The ALJ noted Plaintiff complained that his impairments limited his "ability to squat, bend, stand, walk, and climb stairs," which limited his ability to "put on his shoes, walk too far, and go up a flight of stairs." (Tr. 34). The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" but found "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms" were "not entirely credible" because of the inconsistencies between Plaintiff's allegations, the medical evidence, and Plaintiff's activities. (Tr. 34, 36).

The ALJ summarized and evaluated Plaintiff's medical records and the opinion evidence. She noted that the medical records showed that Plaintiff's "course of treatment has been minimal and conservative with few observations of signs or symptoms which would prevent him from performing work related activities." (Tr. 34). The ALJ gave Nurse Crabtree's medical source statement little weight because it was "not consistent with the findings made during the course of claimant's treatment with Drs. Said and Montgomery" and the nurse practitioner was not an acceptable medical source. (Tr. 36). Based on these considerations and the objective medical evidence in the record, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally stoop, crouch, and climb ramps and stairs but never ladders, ropes, or scaffolds; he cannot kneel or crawl; he should avoid concentrated exposure to vibration and hazards such as unprotected heights and dangerous machinery; and, he requires an option to sit or stand while remaining at the work station for 1 to 3 minutes every hour.

(Tr. 33).

At step four of the evaluation process, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 36). Finally, based on the vocational expert's testimony, the ALJ determined that Plaintiff retained the RFC to perform other jobs existing in significant numbers in the national economy, and was therefore not disabled within the meaning of the Social Security Act. (Tr. 37-38).

### III.    Standard of Judicial Review

The court must affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole. Buford v. Colvin, 824 F.3d 793, 795 (8th Cir. 2016); 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted).   In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security

Administration.  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

## IV.  *Discussion*

Plaintiff asserts that the ALJ's RFC determination is not supported by substantial evidence because the ALJ: (1) failed to fully and fairly develop the record; and (2) improperly discounted Plaintiff's subjective complaints. Defendant responds that: (1) there was substantial evidence in the record to support the ALJ's RFC determination; and (2) the ALJ properly supported her decision to discount Plaintiff's subjective complaints.

### A.  *Development of the record*

Plaintiff first argues that the ALJ did not adequately develop the record because she failed to obtain a consultative examination as recommended by DDS and determined, without supporting medical evidence, that Plaintiff was capable of light work. Defendant responds that the burden of proving a disability lies with Plaintiff and the record contained sufficient evidence for the ALJ to determine Plaintiff's RFC.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Combs v. Berryhill, 868 F.3d 704, 708 (8th Cir. 2017) (quoting Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010)). When a critical issue is undeveloped, fully developing the record requires that the ALJ re-contact a treating or consulting physician.  Vossen, 612 F.3d at 1016 (emphasis in original) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)).  The ALJ is only required to order medical examinations and tests, however, "if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Johnson v. Astrue,

627 F.3d 316, 320 (8th Cir. 2010) (quoting <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1023 (8th Cir. 1994)).

The ALJ determined that, despite his impairments, Plaintiff retained the RFC to perform light work with the following limitations: (1) Plaintiff can occasionally stoop, crouch, and climb ramps and stairs but never ladders, ropes, or scaffolds; (1) Plaintiff can never kneel or crawl; (3) Plaintiff must avoid concentrated exposure to vibration and hazards such as unprotected heights and dangerous machinery; and (4) Plaintiff must have an option to sit or stand at his work station for one to three minutes every hour. (Tr. 33). According to the regulations, "light work" is generally characterized as "(1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." <u>Johnson v. Berryhill</u>, Case No. 4:16-CV-1455 JMB, 2017 WL 3781731, at *11 (E.D.Mo. Aug. 31, 2017) (quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001)).

The sole medical opinion relating to Plaintiff's capacity to work was that of Nurse Crabtree, who found that Plaintiff could lift/carry less than ten pounds frequently, ten pounds occasionally, and twenty pounds rarely. (Tr. 361). She also opined that Plaintiff could: never twist, stoop, balance, crouch, crawl, or climb; frequently reach and handle; occasionally finger and feel; sit ten minutes at a time for a total of two-hours in an eight-hour work day; and stand ten minutes at a time for a total of less than two hours in an eight-hour workday. (Tr. 361). Nurse Crabtree stated that Plaintiff's limiting symptoms included: hips "giv[ing] out"; palpitations; medication causing dizziness, nausea, and weakness; difficulty ambulating; and the need for a cane. (Tr. 360).

The ALJ assigned Nurse Crabtree's opinion "little weight" because he found it was not consistent with the findings of Drs. Said and Montgomery, "which include routinely normal physical examinations and no reports of medication side effects." (Tr. 36). The ALJ also noted that, as a nurse practitioner, Nurse Crabtree was "not an acceptable medical source." (Id.).

Having discounted Nurse Crabtree's opinion, the ALJ drew her own inferences from Plaintiff's medical reports. The ALJ stated that Dr. Montgomery's "course of treatment was routine without complications" and his physical examinations were "unremarkable." (Tr. 34). Similarly, Dr. Said's treatment notes generally noted "no acute distress" and normal strength, gait, and range of motion. (Tr. 35).

Brief notations of "no acute distress" are not particularly significant when considering chronic conditions such as diabetes mellitus, kidney disease, and obesity. See, e.g., Combs, 868 F.3d at 709. Furthermore, the relevance of the treating doctors' unremarkable physical examinations to Plaintiff's ability to function in the workplace is unclear. See, e.g., id. Although Drs. Said and Montgomery regularly noted normal strength, gait, and range of motion, they likewise consistently diagnosed him with hypertension, hypothyroidism, diabetes mellitus, diabetic neuropathy, and chronic kidney disease. By relying on her own interpretation of Plaintiff's treatment notes, rather than seeking clarification from his medical providers, the ALJ failed to satisfy her duty to fully and fairly develop the record.

Upon review, the Court finds that the record contains insufficient medical evidence from which a proper determination of Plaintiff's functional limitations can be made. On remand, a formal assessment of Plaintiff's functional capacities will need to be completed by a physician.

*B. Credibility*

Plaintiff also argues that the ALJ failed to properly analyze his credibility because she did not address the factors required by <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984). Defendant counters that the ALJ identified a variety of inconsistencies that weakened Plaintiff's credibility and incorporated them into her decision.

Before determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007) (citing <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218 (8th Cir. 2001)). An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including: the objective medical evidence and medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness, and side effects of medications and medical treatment; and the claimant's self-imposed restrictions. SSR 96–7p. <u>See also</u> <u>Polaski v. Heckler</u>, 739 F.2d at 1322. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003) (citing <u>Russell v. Sullivan</u>, 950 F.2d 542, 545 (8th Cir. 1991)).

In this case, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (Tr. 34). The ALJ reasoned that Plaintiff's "course of treatment has been minimal and conservative with few observations of signs or symptoms which would prevent him from performing work related activities." (<u>Id.</u>). The ALJ then summarized Plaintiff's medical records, noting inconsistencies such as several unremarkable exams, doctors' visits at which Plaintiff did

not complain of alleged symptoms, reports of steady gait and full range of motion, reports of Plaintiff's "controlled" hypertension and his "stable" kidney disease, and Plaintiff beginning classes to become a probation officer. (Tr. 34-36). Based on these findings, the ALJ concluded that "the inconsistencies between the claimant's allegations and the medical evidence and the combination of his activities do not enhance his credibility." (Tr. 36).

Upon review, the Court finds that, in assessing Plaintiff's credibility, the ALJ discussed many of the factors set forth in <u>Polaski</u>.  <u>See</u> <u>Renstrom</u>, 680 F.3d at 1067. "The ALJ is 'not required to discuss methodically each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints.'" <u>Partee</u>, 638 F.3d at 865 (quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000)). Because the ALJ's determination to discredit Plaintiff's subjective complaints is supported by good reasons and substantial evidence, the Court defers to her determination. <u>See e.g.</u>, <u>Renstrom</u>, 680 F.3d at 1067; <u>Gonzales</u>, 465 F.3d at 894.

## V.    *Conclusion*

For the reasons stated above, the Court finds that the ALJ did not base her RFC determination upon substantial medical evidence and failed to satisfy her duty to fully and fairly develop the record.  Accordingly,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

A judgment of remand shall accompany this memorandum and order.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of October, 2017